1          UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF MISSISSIPPI
2               NORTHERN DIVISION

3

4   UNITED STATES OF AMERICA

5        vs.              Criminal Action No. 3:14CR111

6   CECIL MCCRORY

7

8

9        COURT REPORTER'S TRANSCRIPT OF HEARING

10

        BEFORE HONORABLE HENRY T. WINGATE
11     UNITED STATES DISTRICT COURT JUDGE

12              April 12, 2017
              Jackson, Mississippi
13

14

15   APPEARANCES:

16   MR. DARREN J. LAMARCA
    Assistant United States Attorney
17
        Representing the Government,
18        United States of America

19
    MR. CARLOS TANNER
20   Attorney at Law

21        Representing the Defendant,
        Cecil McCrory
22

23   ALSO PRESENT:     Mr. Don Barrett
                    Mr. George Neville
24                    Mr. Neville Boschert
                    Ms. Carolyn Short
25

```
 1    COURT REPORTER:

 2    Brenda D. Wolverton, RPR, CRR, FCRR
      Jackson, Mississippi
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Good morning.  Call your case.

2          MR. LAMARCA:  Your Honor, before the court is United

3   States versus Cecil McCrory, Criminal No. 3:14cr111.  We are

4   here today, Your Honor, on an unopposed motion filed by the

5   defense for the court to reconsider the fine that was imposed.

6   The court initially entered a $150,000 fine payable in six

7   months or to be paid within six months.  The defendant has

8   filed a motion asking the court to reconsider that fine based

9   upon a financial condition of his client, the filing being by

10  Mr. Tanner.

11         The defendant is present with his attorney, Carlos

12  Tanner, on that motion.  At counsel table for the government is

13  Tye Breedlove of the FBI.  He is an agent.  Pat Lemon, an AUSA

14  in the U.S. Attorney's Office.  Behind me is Kim Mitchell, a

15  financial analyst with the United States Attorney's Office

16  along with the United States Probation Office, Your Honor.

17         THE COURT:  You said the motion is unopposed?

18         MR. LAMARCA:  Yes, Your Honor.  The unopposed motion

19  was for the defendant asking the court to reconsider.  We do

20  not oppose that reconsideration with the court.  We did talk to

21  the defense about the figures that the defense has, and we do

22  believe the court should reconsider the fine amount, but that

23  is, of course, strictly up to the court.  The court imposed the

24  fine amount based upon the financial condition of the defendant

25  as disclosed in the PSR.  The government did not object to the

1    fine that the court imposed.  The government makes no

2    recommendation as to the fine.  Being that as it may, the

3    government did not take a position, did not oppose the motion

4    for the court to reconsider in light of the financial condition

5    of Mr. McCrory.

6         THE COURT:  So what is your ultimate disposition here?

7    Do you agree that the fine amount should be changed, modified?

8         MR. LAMARCA:  Your Honor, not knowing the criteria

9    that the court employed in determining the fine amount, so I

10   would leave that to the court's discretion, I will say to the

11   court that the PSR was somewhat misleading when you consider

12   that the government did receive a money forfeiture from Mr.

13   McCrory which was $1,071,040.52 and that that money forfeiture

14   was not reflected in the financial analysis on the PSR.  The

15   financial analysis on the PSR had the defendant at the time it

16   was prepared showing a net worth of 1.2 million, and the

17   government received $1,071,040 from the defendant on a money

18   forfeiture of 1.2 million.

19        In essence, the money forfeiture, had the government

20   received the full amount, would have left the defendant with a

21   net worth based on the PSR of approximately $34,000.  The PSR

22   shows a net worth of 1.2 million.  Not knowing how the court

23   came to the conclusion of the fine amount, I do acknowledge

24   that out of the defendant's net worth there was no allowance

25   for the money forfeiture that the defendant did pay in the

1    amount of 1,071,000.

2              THE COURT:  Okay.  Thank you.  Now let me go to the

3    defense.  Good morning, Mr. Tanner.  Good morning, Mr. McCrory.

4              MR. TANNER:  Good morning.

5              THE COURT:  Make your motion.  Go to the podium,

6    please.

7              MR. TANNER:  Yes, sir.  Your Honor, the government

8    essentially stated my motion accurately.  The position here,

9    Your Honor, is that we believe that at the time the court

10   fashioned the fine based on the presentence investigation

11   report, namely the balance sheet in the presentence

12   investigation report, the court was looking at a figure which

13   reflected that Mr. McCrory had a net worth of $1.2 million

14   thereabout.  The problem with that, Your Honor, is that it was

15   only after the court had made that pronouncement that I

16   indicated to the court that Mr. McCrory had shown up with at

17   that time a $1.1 million check.  We gave that check to the

18   government the following Monday.  It bounced, frankly, and

19   that's why we ended up with the 1 -- 1,071,000 some odd

20   dollars.

21             The issue is until we handed that check over, it was

22   fairly, although not 100 percent, accurate as to Mr. McCrory's

23   financial picture.  However, the court at the time was looking

24   at numbers that were up to that point accurate, and they were

25   accurate when Mr. McCrory gave those figures to the probation

1    office.  But the government -- the court knows well the purpose

2    of forfeiture.  The court also knows that in most instances you

3    have a situation where the government takes money judgments for

4    forfeiture as opposed to actual cash transfers because most

5    people by the time you get to this point don't have the money

6    to satisfy the forfeiture.  Well, Mr. McCrory did.  He

7    liquidated accounts of various sorts in order to satisfy as

8    best he could that forfeiture that was -- that he agreed to

9    with the government.

10          And so based on that satisfaction of that forfeiture

11   or near satisfaction of the forfeiture, Mr. McCrory simply does

12   not have the funds to satisfy the court's fine.  But we fully

13   appreciate how the court comes up with the fine in terms of if

14   at the time the court made that pronouncement Mr. McCrory had

15   $1.2 million as his net worth, then he should have been able to

16   pay that fine within the 30 days that the court referenced or

17   ordered him to pay it.

18          The problem is, Judge, if the fine is $150,000 to be

19   paid in 30 days, Mr. McCrory, I mean, he is good as in default

20   on day 31 or day 30.  He simply does not have the funds to pay

21   it.  As Mr. LaMarca said, we -- the motion was unopposed, but I

22   appreciate the court wanting a more complete record on the

23   matter, and so the court ordered us to come back and to lay

24   these items out if it was necessary.

25          THE COURT:  At the time that I imposed the fine, no

1   one objected to the $150,000.

2          MR. TANNER:  Well, Your Honor, when you imposed the

3   $150,000, Mr. McCrory perked up in his seat and the court then

4   immediately said, *I want the government and the defense to go*

5   *back and figure out if there is some sort of payment plan that*

6   *could hammer this matter out.*  We did that, and in looking at

7   those numbers, we saw that there was simply no way that Mr.

8   McCrory could do a payment plan anywhere near -- to satisfy

9   anywhere near the 150,000.

10          The government -- and I believe Mr. LaMarca has said

11   this on the record.  The government is fine with the million

12   71,000 and then taking a money judgment for the rest, but to

13   the extent that the court is requiring or will require Mr.

14   McCrory to pay the 150, he simply does not have it.

15          THE COURT:  All right.  And then furthermore at the

16   time of sentencing I had the presentence investigation report.

17   That report also includes the finances of the defendant, and it

18   gave his net worth at that 1.2 million.

19          MR. TANNER:  Yes, Your Honor.

20          THE COURT:  And no one asked me to make an adjustment

21   to that net worth.  So at the time of sentencing what I had was

22   $1.2 million in net worth which certainly would support a

23   $150,000 fine.  And there was no objection at the time that he

24   did not have the money, because, as you said, he had not

25   submitted the check at that time.

1           MR. TANNER:  That's right.

2           THE COURT:  Okay.  All right.  Now, what is your

3    request with regard to this $150,000 fine?

4           MR. TANNER:  Your Honor, I'm asking the court to

5    significantly lower the amount that Mr. McCrory has to pay.

6    And, in addition to lowering the amount, I would ask the court

7    not to require the fine to be paid during the time -- he is

8    just not going to be able to pay it between now and the time he

9    reports to prison, and he is not going to be able to pay it

10   while he is in prison, Your Honor.  So the court would -- I

11   mean the defense would ask the court whatever fine it decides

12   to impose, and we ask that it be lowered, we ask the court to

13   make that fine payable at some point while Mr. McCrory is on

14   supervised release.

15          THE COURT:  And so what amount are you requesting?

16          MR. TANNER:  Your Honor, we are asking for a fine in

17   the amount of 15 or $20,000, Your Honor.  And I know that's a

18   significantly lower amount.  Mr. McCrory doesn't have -- the

19   government -- we met -- I met with the government and its

20   analyst or financial analyst.  The whole purpose of this

21   forfeiture, as the court is aware, is to be a punishment over

22   and above restitution and separate and apart from the fine.

23   The government went through every single financial account that

24   Mr. McCrory has and took that, by agreement, of course, took

25   that as forfeiture.  And so we're looking at an unusual

1    situation where the government, not that they don't always look

2    for forfeitable funds, but they went through everything he had

3    and they reached an agreement that they would forfeit pretty

4    much all of that money.  And that's what happened.

5              So by the time we come before the court, granted,

6    until he tenders the check, we don't really have an objection

7    as such to the overall net worth, but up until that point, it

8    sort of accurately reflected the ballpark figure of what his

9    net worth was.

10             THE COURT:  I understand what you are saying is that

11   at the time of the sentencing the PSR reflected $1.2 million in

12   net worth.

13             MR. TANNER:  Yes, Your Honor.

14             THE COURT:  And no one at that time indicated that

15   that might be significantly reduced by the payment of these

16   funds if indeed he could pay that $1.1 million that the court

17   had ordered -- 1.2.

18             MR. TANNER:  1.2, Your Honor.

19             THE COURT:  1.2 million.  And subsequently he paid

20   that amount.  And then thereafter was this concern whether he

21   could make the $150,000 after he had paid that amount.  Okay.

22   So I set this hearing so I can see what his financial

23   capability is at this point so as to reach some sort of

24   conclusion as to what an appropriate fine would be.

25             MR. TANNER:  Yes, Your Honor.

1          THE COURT:  You are asking for somewhere in the

2   neighborhood of 20 to 30,000.

3          MR. TANNER:  15 to 20.

4          THE COURT:  All right.  The prosecution takes no

5   position on it as to any amount.  Is that correct?

6          MR. LAMARCA:  That is true, Your Honor.

7          THE COURT:  So the prosecution takes no position as to

8   whether any amount should be paid; you don't care.

9          MR. LAMARCA:  That is a matter for the court.  The

10  government did make its recommendation at Mr. McCrory's

11  original sentencing with regard to the guidelines and that

12  calculation.  The government did not opine as to the fine

13  amount and does not plan to opine unless the court requests it

14  as to the fine amount today, Your Honor.

15         THE COURT:  Do you want to make one?

16         MR. LAMARCA:  No, Your Honor, do not.

17         THE COURT:  Then I turn to probation.  Ms. Harrell,

18  you are the probation officer in this case.

19         PROBATION OFFICER:  Yes, sir.

20         THE COURT:  And you had a recommendation for a

21  $150,000 fine.

22         PROBATION OFFICER:  Yes, sir.

23         THE COURT:  And so this was in the probation report

24  that a fine would be warranted and the fine could be in an

25  arena of $150,000.

1    PROBATION OFFICER:  Yes, Your Honor.  The guideline

2 range for the fine in Mr. McCrory's case was $20,000 to

3 $500,000.  So a $150,000 fine was actually in the lower part of

4 that range and was based on the defendant's financial condition

5 prior to the sentencing hearing.

6    THE COURT:  Okay.  Prior to the hearing.

7    PROBATION OFFICER:  That's correct.

8    THE COURT:  All right.  So then in your recommendation

9 you asked the court to consider imposing a fine of $150,000.

10    PROBATION OFFICER:  That's correct.

11    THE COURT:  And you made that recommendation because

12 you thought that was within the guideline range and further

13 that he was capable of paying the $150,000.

14    PROBATION OFFICER:  Yes, Your Honor.  At the time that

15 I composed the recommendation, yes.

16    THE COURT:  All right.  And I followed your

17 recommendation and imposed a fine of $150,000.

18    PROBATION OFFICER:  Yes, sir.

19    THE COURT:  Now, have you had a chance to look at his

20 finances since?

21    PROBATION OFFICER:  Yes, Your Honor.  I met with

22 Mr. Tanner yesterday afternoon and he took me through the

23 defendant's updated financial condition, and I believe the

24 representations that Mr. Tanner has made to the court are

25 commensurate with those figures that we went over yesterday.

```
1            THE COURT:  Okay.  And based on the figures you have
2    seen now and the chance you have had to study it, since you
3    know Mr. McCrory's finances quite well, since you have
4    investigated this from the start, then does probation have a
5    recommendation as to the amount of fine the court should
6    impose?  And, of course, all parties here know that probation
7    works directly for the court, not for the defense, not for the
8    prosecution, but only for the court, which is why the court
9    counsels with the probation officer on cases to which that
10   officer is assigned.  So then based on your investigation of
11   his finances, then what is the recommendation from probation?
12           PROBATION OFFICER:  Your Honor, if I may, can I take
13   the court through the provisions of 5E1.2(d)?
14           THE COURT:  Go right ahead.
15           PROBATION OFFICER:  These are the -- in determining
16   the amount of the fine, these are the factors that the court
17   shall consider.
18           Number one is the need for the combined sentence,
19   meaning the fine in addition to whatever other punitive
20   measures the court has taken.  To reflect the seriousness of
21   the offense including the harm or loss to the victim and the
22   gain to the defendant, to promote respect for the law, to
23   provide just punishment and to afford adequate deterrence.
24           Number two, any evidence presented as to the
25   defendant's ability to pay the fine, including the ability to
```

pay over a period of time in light of his earning capacity and financial resources.

Number three, the burden that the fine places on the defendant and his dependents, dependent relatives to alternative punishments.

Number four, any restitution or reparation that the defendant has made or is obligated to make.

Number five, any collateral consequences of conviction, including civil obligations arising from the defendant's conduct.

Number six, whether the defendant previously has been fined for a similar offense.

Number seven, the expected cost to the government of any term of probation or term of imprisonment and the term of supervised release imposed and any other pertinent equitable considerations.

It ends in saying the amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive. I think a $20,000 fine in this case would be punitive given the defendant's financial condition at this time.

THE COURT: Okay. So then you are recommending a fine of less than $20,000?

PROBATION OFFICER: No, Your Honor. I said $20,000. I said I believe a fine of $20,000 which would still be within

1    the guideline range would meet all of those considerations.  It

2    would be punitive without being unduly harsh on the defendant

3    or his dependents.

4            THE COURT:  It would not be punitive?

5            PROBATION OFFICER:  Would be punitive.

6            THE COURT:  I don't quite understand that language.

7    The fine should not be punitive, should it?

8            PROBATION OFFICER:  No.  What the guidelines say is

9    that the amount of the fine should always be sufficient to

10   ensure that the fine, taken together with other sanctions

11   imposed, is punitive.  The fine is a punishment.

12           THE COURT:  All right.  So you are saying it would be

13   an appropriate punishment at 20,000?

14           PROBATION OFFICER:  Yes, Your Honor.

15           THE COURT:  Okay.  Thank you.

16           Now, when you came to the hearing today, did you

17   intend to put on any proof of your client's current net worth?

18           MR. TANNER:  If necessary, yes, Your Honor.  I came

19   prepared to do so.

20           THE COURT:  I thought you did.  And who would be your

21   witness?

22           MR. TANNER:  Mr. Cecil McCrory.

23           THE COURT:  All right.  Call your witness then.

24           MR. TANNER:  Mr. McCrory.

25                         **CECIL MCCRORY,**

1    having first been duly sworn, testified as follows:

2                    **DIRECT EXAMINATION**

3    BY MR. TANNER:

4    Q   Mr. McCrory, reintroduce yourself to the court, please.

5    A   Cecil McCrory.

6         THE COURT:  Speak directly into that microphone if you

7    don't mind.  Is the green light on?

8         THE WITNESS:  Yes, sir.

9         THE COURT:  Okay.  Go ahead.

10   BY MR. TANNER:

11   Q   Mr. McCrory, you and I went over the presentence

12   investigation report in detail.  Did we not?

13   A   Yes.

14   Q   And when we did so, we looked at the section in paragraphs

15   or Paragraph 124 which referenced your financial condition or

16   ability to pay.  Did we not?

17   A   Yes.

18   Q   All right.  Now, the cash flow that the probation office

19   came up with in terms of what your monthly income was at the

20   time and what your monthly expenses were at the time was only

21   $29 per month.  Is that right?

22   A   Yes.

23   Q   I want to turn -- looking to Paragraph 124 --

24        MR. TANNER:  Your Honor, may I approach?

25        THE COURT:  You may.

1            MR. TANNER:  May I have this marked for I.D. only?

2            THE COURT:  Okay.  For I.D. only.  Right here.

3       (EXHIBIT D-1 MARKED)

4            THE COURT:  Identification only.  D-1.

5  BY MR. TANNER:

6  Q    Sir, I'm handing you what's been marked for identification

7  only as Defendant's Exhibit 1.  Do you recognize that document,

8  sir?

9  A    I do.

10  Q    And what do you know it to be?

11  A    It's a financial condition.

12  Q    What I would like to do is go through each one of these

13  line items under your financial -- what's listed here as your

14  assets.  Okay?

15  A    Yes.

16  Q    All right.  Let's turn to the first line item which is your

17  personal checking account, and it states that this is a

18  Priority Bank account.  It has a dash and says spouse in the

19  amount of $837.97.  Did you provide the probation office with

20  that information so that the probation office could come up

21  with this balance sheet for you?

22  A    Yes.  It's $837,097.

23  Q    Okay.  I apologize.  And that -- was that -- at the time

24  you gave it to probation, was that information as accurate as

25  you could make it?

1    A    Yes.

2    Q    Now, that Priority One bank account, if I showed you a copy

3    of that Priority One bank account, do you think you would

4    recognize it?

5    A    Yes.

6            MR. TANNER:  Your Honor, may I approach and get this

7    marked?

8            THE COURT:  Okay.

9        (EXHIBIT D-2 MARKED)

10   BY MR. TANNER:

11   Q    Sir, I'm handing you what's been marked as Defendant's

12   Exhibit 2 for I.D. only at this point.  Do you recognize that

13   document, sir?

14   A    Yes.

15   Q    And what do you know it to be?

16   A    A statement -- a bank statement on my personal account.

17   Q    All right.  Referring to the upper right-hand corner of

18   that document, do you see on Defendant's Exhibit 2 where it

19   lists an account number on the document I just gave you?

20   A    Oh, yes.

21   Q    Do you see the account number ending in 558?

22   A    Yes.

23   Q    All right.  Is this the account that you were referencing

24   as your personal checking account, Priority Bank, spouse, in

25   the amount of $837,097?

1    A    Yes.

2    Q    All right.  I want to -- and is this information, is this a

3    true and accurate copy of your Priority One bank account as of

4    April 15, 2015?

5    A    Yes.

6         MR. TANNER:  Your Honor, at this time I offer this

7    exhibit into evidence as an exhibit to the proceeding.

8         THE COURT:  Any objection?

9         MR. LAMARCA:  No objection.

10        THE COURT:  Admitted.

11    (EXHIBIT D-2 MARKED)

12   BY MR. TANNER:

13   Q    Sir, I want to turn your attention to the first page of

14   Defendant's Exhibit 2.  Now, when you're looking at that page,

15   do you see at the bottom where it says balance by date?

16   A    Yes.

17   Q    And as of March 25, 2015, what was the balance on that

18   date?

19   A    866,668.67.

20   Q    Okay.  And that's fairly close to the 837,000 that you were

21   trying to give the probation office.  Right?

22   A    Yes.

23   Q    And at the time you had that meeting with the probation

24   office, where did that meeting occur?

25   A    Here in the probation office.

```
1    Q    Downstairs?

2    A    Downstairs.

3    Q    First floor of the federal courthouse?

4    A    Yes.

5    Q    Did you have this document in hand or were you trying to

6    recall from memory?

7    A    I had written down notes to bring with me but I didn't have

8    this document, no.

9    Q    Okay.  So were you trying to be accurate when you gave her

10   that $837,000 figure?

11   A    Yes.  Absolutely.

12   Q    All right.  Now let's talk about -- let's go up to where it

13   says previous statement balance as of March 18, 2015.  Do you

14   see that in the statement summary section of Exhibit 2?

15   A    Yes.

16   Q    All right.  Now, as of 3-18-2015, just a couple days prior

17   to your meeting with probation, what was the balance on the

18   account?

19   A    419,707.32.

20   Q    Okay.  So at some point between -- during that seven-day

21   period or so, you obviously added about $400,000 to the

22   account?

23   A    Yes.

24   Q    I want to turn to Page 3 of Defendant's Exhibit 2.  So two

25   days -- I'm looking -- for the benefit of the record, I'm
```

1   looking at the upper left-hand corner of Page 3 of Defendant's
2   Exhibit 2.  Do you see a deposit slip where you deposited
3   $451,968.81 --
4   A    Yes.
5   Q    -- into the account?
6   A    Yes.
7   Q    And that occurred on March 23rd, 2015?
8   A    Yes.
9   Q    That's only two days prior to your meeting with the
10  probation office.  Right?
11  A    Yes.
12  Q    Tell the court why you put that 451,000 into this account
13  ending in 558.
14  A    I liquidated all my stock.
15  Q    Okay.  All right.  So at this point I would like to zoom in
16  a little bit on your deposit slip.  Now, it says that this 451
17  plus thousand dollars or 451,000-plus dollars was made up of
18  two -- you noted two separate entries as what made up that
19  deposit.  Did you not?
20  A    Yes.
21  Q    All right.  NFS in the amount of $89,840.19.  What was that
22  money, sir?
23  A    That was some stock that I had set up for grandchildren's
24  college.
25  Q    All right.  So this 89,000 was an investment you had for

1  your grandchildren's college tuition and such.  Right?

2  A   Yes.

3  Q   So you liquidated that.  Now, right below that, I believe

4  the second notation says Jackson National.  What is that, sir?

5  A   Stock.

6  Q   You liquidated stock in order to put that money for the

7  purpose of forfeiture.  Did you not?

8  A   Yes.

9  Q   All right.  And all of that happened on March 23rd, 2015?

10 A   That's correct.

11 Q   All right.  So that deals with the 837 in Exhibit A and how

12 we get to the 800 some odd thousand dollars.  Right?

13 A   Yes.

14 Q   What I would like to do now is skip down to the fourth

15 item.  If you look back at Defendant's Exhibit 1 for I.D., the

16 first document I gave you, the presentence report?

17 A   Okay.

18 Q   Now the fourth item down is an item for $1,013,558.  Right?

19 A   Yes.

20 Q   Now, what does it note on the presentence investigation

21 report that those funds represent?

22 A   Certificates of Deposit.

23 Q   All right.  So you had $1,013,558 in CD's with Renasant

24 Bank.  Did you not?

25 A   Yes.

1    Q    I want to skip down to the liability section.  Do you see

2    where it says personal loans, Renasant Bank, secured by CD?

3    A    Yes.

4    Q    What's the amount that is secured by the CD's up in your

5    assets section?

6    A    $607,669.

7    Q    Okay.  Is it saying that these particular -- this

8    particular loan is secured by the CD's that we mentioned

9    earlier?

10   A    Yes.

11   Q    All right.  And did you -- in order to satisfy the

12   forfeiture portion of your plea agreement with the government,

13   did you have to liquidate those funds?

14   A    Yes.

15   Q    You did?

16   A    Yes.

17   Q    If I showed you documents reflecting that liquidation,

18   would you recognize them, sir?

19   A    I probably would.

20   Q    Okay.

21        MR. TANNER:  May I approach, Your Honor?

22        THE COURT:  You may.

23   BY MR. TANNER:

24   Q    (Tenders documents.)  Mr. McCrory, I have just handed you

25   documents labeled Defense Exhibits 3-A, 3-B and 3-C.  Do you

```
 1   have those documents in front of you?
 2   A   Yes, I do.
 3   Q   Do you recognize those documents?
 4   A   Yes.
 5   Q   Tell the court what 3-A is.
 6   A   3-A is an official check from Renasant Bank for 406,279.45.
 7   Q   All right.  What's 3-B?
 8   A   It's a deposit at Priority Bank in the amount of
 9   400,279.45.
10   Q   All right.  And what is 3-C, sir?
11   A   Renasant Bank loan payment of 607,565.22.
12           MR. TANNER:  Your Honor, I offer into evidence --
13   BY MR. TANNER:
14   Q   Do those truly and accurately depict the deposit slips you
15   received and the loan payment documents you received when you
16   cashed out the CD's and paid off the loan?
17   A   Yes, they do.
18           MR. TANNER:  Your Honor, I offer these exhibits into
19   evidence as exhibits to the proceeding.
20           THE COURT:  Any objection?
21           MR. LAMARCA:  None, Your Honor.
22           THE COURT:  Accepted.
23      (EXHIBITS D-3-A, D-3-B AND D-3-C MARKED)
24   BY MR. TANNER:
25   Q   3-A.  3-A is where you received a check for 406,279?
```

1    A    Yes.

2    Q    3-A.   You have $406,279, and that is a check that you

3    received on April 15, 2015, from Renasant Bank.   Right?

4    A    Yes.

5    Q    All right.   Now, at the same time on that same date, you

6    received 3-C, which is a receipt showing the payment of a loan

7    in the amount of $607,565.22.   Is that right?

8    A    Yes.

9    Q    And so this is where -- so down here where we have Renasant

10   Bank secured by a CD, we can X that out as a liability that's

11   been paid.   Right?

12   A    Yes.

13   Q    And up here in the assets section in Exhibit 1 where we

14   have 1,013,558, we can make a notation that that money was

15   essentially $406,279.45.   Am I right?

16   A    Yes.

17   Q    Now once you got that check in the amount of $406,279.45,

18   what did you do with it, sir?

19   A    Deposited it in the Priority Bank account.

20   Q    And that's reflected in Document 3-B.   Is that right?

21   A    That's right.

22   Q    And it's also reflected in Exhibit 2.   Is it not?

23   A    Yes.

24   Q    All right.   Now, if you see the $406,279.45, it says less

25   cash received, $6,000.   Does it not?

1    A    Yes.

2    Q    Tell the court what happened to that $6,000.

3    A    I kept it out.  I go to the casino time and again, and

4    that's what I used it for.

5    Q    But on balance you put the bulk of that money into this

6    account?

7    A    Yes.

8    Q    And you have already explained to the court that this

9    account ending in 558, you were liquidating and putting money

10   in there so you could pay the forfeiture.  Right?

11   A    Yes.

12   Q    All right.  Now, this account, looking at Page 3 of Exhibit

13   2, now I see checks and such out of this account.  Was this

14   account being used for bills during the time when you were out

15   pending sentencing?

16   A    Yes.

17   Q    All right.  So your monthly expenses were coming out of

18   this account all the while?

19   A    Most of them, yes, sir.

20   Q    All right.  And we didn't reflect -- and at that time were

21   you having income coming in through working like you had prior

22   to your being charged in this case?

23   A    No, I didn't.

24   Q    I want to go down to the second section or the second line

25   item on the Exhibit 1, the presentence investigation report

1   asset list.  All right.  Do you see where it says $4,300?

2   A   Yes.

3   Q   All right.  Now, what account -- if I showed you an account

4   that this $4,300 references, would you recognize it, sir?

5   A   Yes.

6   Q   All right.  Why do you have that amount in that account,

7   sir?

8   A   That 4,300?

9   Q   Yes.  Why did you leave 4,300 in one of your accounts?

10  A   I was leaving it there 60 days to clear any checks that

11  were out.

12  Q   And was that a College Street Leasing account, sir?

13  A   Yes.

14          MR. TANNER:  Your Honor, may I approach?

15          THE COURT:  You may.

16  BY MR. TANNER:

17  Q   (Tenders document.)  I have handed you what's been marked

18  for identification at this point as Defendant's Exhibit 4.  Do

19  you recognize that document, sir?

20  A   Yes, I do.

21  Q   Is that the College Street Leasing account that we just

22  referenced?

23  A   Yes.

24  Q   All right.  And is that the one that was referenced for the

25  $4,300?

1    A    Yes.

2    Q    All right.  And you said you left that account with 4,300

3    in case there were any bills or checks that hadn't cleared?

4    A    Yeah, that was the balance taken out of my checkbook.

5    Q    And the document I handed you in Exhibit 4, is that a fair

6    and accurate depiction of your account balance as of March 31

7    of 2017?

8    A    Yes.

9    Q    All right.  So some money has cleared off of that account.

10   Has it?

11   A    Yeah, but I don't keep that checkbook, so I don't know.  I

12   don't know where it went.

13          MR. TANNER:  Your Honor, at this time I offer into

14   evidence as an exhibit to this proceeding Defense Exhibit 4.

15          THE COURT:  Any objection?

16          MR. LAMARCA:  No, Your Honor.

17          THE COURT:  Accepted.

18    (EXHIBIT D-4 MARKED)

19   BY MR. TANNER:

20   Q    Sir, and as of March 2017, March 31st, 2017, the account

21   that you had previously referenced as having $4,300 in it has

22   what in it?

23   A    $3,153.44.

24   Q    Now, this $43,000, going back to Defense Exhibit 1 for

25   I.D., the presentence report.

1    A    Uh-huh.

2    Q    Do you see it?

3    A    Yes.

4    Q    Do you see the notation that says that you have a personal

5    checking account Renasant Bank joint with spouse in the amount

6    of $43,000?

7    A    Yes.

8    Q    All right.  Tell the court what that money represents.

9    A    An inheritance to my wife from her late aunt.

10   Q    And so that M&F Bank, did that not used to be Renasant or

11   did Renasant Bank not used to be M&F?

12   A    Renasant bought M&F.

13   Q    All right.  So now it's Renasant, but they acquired or

14   purchased M&F Bank.  Is that right?

15   A    That's right.

16   Q    If I showed you a document that referenced your wife

17   inheriting the bulk of this $43,000, would you recognize it?

18   A    Yes.

19        MR. TANNER:  May I approach, Your Honor?

20        THE COURT:  You may.

21   BY MR. TANNER:

22   Q    (Tenders document.)  Sir, I have handed you what's been

23   marked as Defense Exhibit 5.  Do you recognize that document?

24   A    Yes.

25   Q    Tell the court what it is, sir.

1    A    It's a letter from an attorney, James Attaway, Jr., from

2    Quitman, Texas, referencing the Estate of Vera Anne Morgan

3    Duval, and she had left my wife's mother a portion of her

4    estate.  Her mother died, so the four children got or the three

5    children all inherited her portion of it.

6    Q    Okay.  And is that a true and accurate copy of the document

7    that shows the transfer of the $31,750?

8    A    Yes.

9            MR. TANNER:  Your Honor, we offer Exhibit 5, Defense

10   Exhibit 5 into evidence as an exhibit to the proceeding.

11           THE COURT:  Any objection?

12           MR. LAMARCA:  No, Your Honor.

13           THE COURT:  All right.  It will be admitted.

14       (EXHIBIT D-5 MARKED)

15   BY MR. TANNER:

16   Q    Sir, I'm putting on the screen this document which shows

17   that on April 12, 2012, your wife was listed here, Janice

18   McCrory.  That's your wife.  Right?

19   A    Yes.

20   Q    And she was listed as a beneficiary to the Estate of

21   Mrs. Vera Anne Morgan?

22   A    Yes.

23   Q    Vera Duval?

24   A    Yes.

25   Q    And as part of that distribution of the estate, your wife,

1  along with the other beneficiaries, received a check in the

2  amount of $31,750.  Right?

3  A    That's correct.

4  Q    Now, your wife deposited that $31,750 into a M&F Bank

5  account.  Right?

6  A    Right.

7  Q    Is that the same account that you said represents this

8  $43,000?

9  A    Yes.

10 Q    And your wife had a little bit of money in it prior to

11 depositing that check.  Right?

12 A    Yes.  She had about $2,300.

13 Q    Okay.  And then she has from time to time had other monies

14 go into the account like social security and that kind of deal?

15 A    Yes.

16 Q    If I showed you an M&F Bank document which reflects that

17 $31,750 being deposited into your wife's account for her

18 inheritance, would you recognize it?

19 A    Yes.

20         MR. TANNER:  May I approach, Your Honor?

21         THE COURT:  You may.

22 BY MR. TANNER:

23 Q    (Tenders document.)

24 A    Would you hand me a water cup, please?

25 Q    (Attorney complies.)  All right.  So that M&F Bank account,

1   is that a true and accurate copy of the M&F Bank account which

2   shows that your wife deposited that inheritance check into her

3   bank account?

4   A    Yes.

5   Q    Now you are listed on that account.  Are you not?

6   A    Yes, but I hadn't written a check on that account in 25

7   years.

8   Q    Okay.

9             MR. TANNER:  Your Honor, at this time I offer Defense

10  Exhibit 6 into evidence.

11            THE COURT:  Any objection?

12            MR. LAMARCA:  No, Your Honor.

13            THE COURT:  Admitted.

14      (EXHIBIT D-6 MARKED)

15  BY MR. TANNER:

16  Q    I'm showing you that document on the screen.  This is the

17  M&F Bank account that we are talking about, the account ending

18  in 0045.  Do you see it?

19  A    Yes.  It's not on the screen, but I have it.

20  Q    And that lists the date of this account or the date of this

21  statement is April 20th, 2012.  Right?

22  A    Yes.

23  Q    Let's go down to the amount we just showed from the

24  inheritance.  Right here it shows a deposit in the amount of

25  $31,750.  Do you see that in the deposit section?

1   A   Give me just a second and let me find it.

2   Q   At the top.

3   A   I have -- I have it.  Yes, I have it.

4   Q   So on April 18, 2012, she deposited $31,750.  Is that

5   right?

6   A   Yes.

7   Q   Now, let's go down -- let's go right above that line that

8   says this statement as of April 20th, 2012, your wife had about

9   $34,039 in that account.  Isn't that right?

10  A   Yes.

11  Q   Is this the same account that we are talking about for this

12  43,000?

13  A   Yes.

14  Q   All right.  So the bulk of that money comes from an

15  inheritance from your wife and you have had nothing to add to

16  that account since the time.  Is that right?

17  A   Well, my social security goes into it now, but --

18  Q   Do you know about how much that is or how much that

19  represents from the time she put in this money?

20  A   Well, from December of last year, my total retirement

21  income is about $3,000 a month.

22  Q   Okay.

23  A   Hers is just under a thousand, I think.

24  Q   And that's referenced in the cash flow section?

25  A   Yes.

1    Q    And it's shown that your cash flow is only $29 positive.

2    Right?

3    A    That's right.

4    Q    All right.  Now, let's go -- we have already dealt with the

5    line that says one million thirteen dollars five hundred

6    fifty-eight.  Let's go down here to the retirement account.  It

7    says you have an SEP with Met Life?

8    A    Yes.

9    Q    Now that SEP at the time you gave this report or gave

10   Officer Harrell this information, that SEP was worth $9,500.

11   Right?

12   A    Yes.

13   Q    And since that time that SEP has, in all candor to the

14   court, increased in value.  Has it not?

15   A    Yes.

16   Q    All right.  That SEP is now, as of December 31st, 2016,

17   worth $12,841.19.  Isn't that right?

18   A    Yes.

19   Q    So on that section, we would have to increase your assets

20   by $3,300 and some change.  Right?

21   A    Yes.

22   Q    All right.  Now, your wife -- it lists as an asset a 2005

23   Cadillac DTS valued at $6,000?

24   A    Yes.

25   Q    Did you have that Cadillac valued at $6,000 at the time you

1    made this report?

2    A    Yes.

3    Q    At the time you gave the information to probation?

4    A    Yes.

5    Q    Do you still have that Cadillac?

6    A    No.

7    Q    Tell the court where the Cadillac is.

8    A    It was 10 years old.  It just started having problems, so

9    my wife traded it in on another used car, a 2014 Cadillac STS.

10   It is a small SUV, whatever the initials are for it.

11   Q    And if I showed you a document related to the sale of that

12   Cadillac, would you recognize it, sir?

13   A    Yes.

14           MR. TANNER:  May I approach, Your Honor?

15           THE COURT:  You may.

16   BY MR. TANNER:

17   Q    (Tenders document.)  Sir, I have just handed you what's

18   been marked as Exhibit 7 for I.D. only at this time.  Tell the

19   court what Defense Exhibit 7 is.

20   A    It's a sales order from Barksdale Cadillac.

21   Q    Okay.  And as far as this Cadillac is concerned, when your

22   wife bought this Cadillac, did she do a trade-in?

23   A    Yes.

24   Q    Does this document reflect that trade-in?

25   A    Yes.

1    Q    Is this a fair and accurate copy of the sales document your

2    wife used a trade and purchase a new vehicle?

3    A    Yes.

4              MR. TANNER:  Your Honor, at this time we offer into

5    evidence Defense Exhibit 7.

6              THE COURT:  Any objection?

7              MR. LAMARCA:  No, Your Honor.

8              THE COURT:  Admitted.

9         (EXHIBIT D-7 MARKED)

10   BY MR. TANNER:

11   Q    Sir, I'm asking you to look at the top line or a line near

12   the top of this sales receipt in Defendant's Exhibit 7 where it

13   lists a purchaser.  Who is the purchaser, sir?

14   A    Janice McCrory.

15   Q    All right.  I want to come down to, for the record

16   purposes, about a third of the way down the page.  Do you see

17   where it says used car trade-in?

18   A    Yes.

19   Q    And what car is listed as the car traded in?

20   A    2005 Cadillac Deville.

21   Q    And that's on the left-hand side of the document about a

22   third of the way down.  At this point I want to go about

23   halfway down D-7 and look at what was listed as the trade

24   allowance on that Cadillac Deville.

25   A    $6,000.

1   Q    So that shows that your wife got value the full $6,000 you

2   estimated for the value of the 2005 Cadillac as listed in your

3   assets section of your presentence investigation report.

4   Right?

5   A    Yes.

6   Q    So you don't have that $6,000 anymore.  Right?

7   A    No.

8   Q    Now, the next line item says a vehicle, 2000 Jeep.  It

9   lists the value at 4,800.  Do you see that value and item

10  listed on your presentence report?

11  A    Yes.

12  Q    Sir, do you still have that 2000 Jeep?

13  A    Yes.  That's my only means of transportation.

14  Q    I need you to speak up just a little bit more.

15  A    Yes, I do.  That's my only means of transportation.

16  Q    And that value, have you looked up the value of that 2000

17  Jeep now?

18  A    Yes.

19  Q    All right.  And what is the value of that 2000 Jeep?

20  A    I don't have the --

21  Q    If I showed you a document related to your looking up the

22  value of that 2000 Jeep Wrangler, do you think that might

23  refresh your recollection as to what the value is at this

24  point?

25  A    Yes.

1            MR. TANNER:  May I approach, Your Honor?

2            THE COURT:  You may.

3   BY MR. TANNER:

4   Q    (Tenders document.)  Sir, I have just handed you a Blue

5   Book sheet that shows the Blue Book value of that Jeep

6   Wrangler.  I want you to look at that and tell me whether that

7   refreshes your recollection as to the Blue Book value.

8   A    Yes, it does.

9   Q    Tell the court what that value is on that Jeep Wrangler at

10  this point.

11  A    $4,414.

12  Q    Okay.  And is the Blue Book value the same thing you used

13  to determine that it was worth 4,800 back then?

14  A    No, I estimated.

15  Q    All right.  Now, so the value has increased about 300 plus

16  dollars.  Is that right?

17  A    It's decreased?

18  Q    Decreased.  Excuse me.

19  A    That's right.

20  Q    Now, you still have the vehicle, the 2000 Ford F550 flatbed

21  truck?

22  A    No.

23  Q    Where is that vehicle?

24  A    It was sold about a year and a half ago.

25  Q    Okay.  And at the time, you listed it as valued at $3,500?

1   A    Yes.

2   Q    What did you sell it for?

3   A    $3,000.  The engine had started going bad.

4   Q    All right.  The remaining assets, sir, farm equipment you

5   have at $16,000.  Tell the court what that farm equipment is.

6   This is mainly for the purpose of the question of whether the

7   court should order you to liquidate that.

8   A    Yes, it's for a tractor and bush hog, a box blade.  I think

9   that's about it.  You have to have it to maintain the family's

10  land.

11  Q    And this is the land where your wife and son and everybody

12  lives?

13  A    My sisters, too.  Yes.

14  Q    Now, you also have a 2013 Texas Bragg trailer.  Do you

15  still have that trailer?

16  A    Yes, I do.

17  Q    And what's the value of that trailer now?

18  A    It's still close to that.  It's probably at least 1,600.

19  Q    Okay.  And the farm equipment that you previously listed as

20  worth $16,000, that was about two years ago.  What would it be

21  worth now?

22  A    I would think 14 or 15,000.

23  Q    And you used to be in the tractor business.  Right?

24  A    Yes.

25  Q    Did you have any sort of Blue Book or NADA thing to

```
 1    determine that it was worth 16,000?
 2    A    No, sir.  I don't know -- I don't even though that one
 3    exists for them.
 4    Q    So how did you know 16,000 when you represented that?
 5    A    Well, I sold a lot of tractors.  I know what they bring.
 6    Q    So based on that same sort of expertise that we relied on
 7    to say 16,000, are you using that same sort of knowledge or
 8    expertise to determine that it's 14,000?
 9    A    Yes.
10    Q    Let's go back down -- we have covered all the assets.  Now,
11    as far as this money, the money that we have left, is this what
12    you used -- we have dealt with every item on the asset list.
13    Is this what you used to determine -- I mean to pay the money
14    to the government for forfeiture purposes?
15    A    Yes.
16    Q    All right.  Let's go down to -- now, you also had about
17    $155,000 in attorneys fees that were not listed here between
18    three lawyers.  Right?
19    A    Yes.
20    Q    Between myself, Don Leland, your prior lawyer, and your son
21    for legal work he did for you.  Right?
22    A    Yes.
23    Q    Now, the credit card balance, the Visa, that's about the
24    same under the liability section?
25    A    I see it.  Yes, that's about right.
```

1   Q    The American Express is about the same?

2   A    Yeah, probably a lot lower, but it's probably around a

3   hundred dollars.

4   Q    Okay.  All right.  And then the Community Bank, do you

5   still have a note with Community Bank?

6   A    Yes.

7   Q    We have already eliminated the 607,000 that you paid when

8   you liquidated the CD's.  Right?

9   A    Yes.

10   Q    And this attorneys fees, you paid -- this attorneys' fee

11   that you had listed that you owed prior to my getting involved

12   in the case, the one that was outstanding, did you -- you have

13   satisfied that attorney's fee portion.  Right?

14   A    Yes.

15   Q    So that's not a current liability.  Right?

16   A    Right.

17        MR. TANNER:  Your Honor, may I have one moment,

18   please?

19        THE COURT:  All right.

20   (SHORT PAUSE)

21   BY MR. TANNER:

22   Q    Now, we've talked about the check that you gave the federal

23   government to satisfy the forfeiture that you agreed to pay,

24   and that amount was referenced earlier, but what was the amount

25   of the first check you gave to the government?

1  A   1.2 million.

2  Q   The first check you gave them, was it not 1.1 million?

3  A   1.1 million, yes, sir.  I was going by my checkbook balance

4  rather than checking my statement, so that's how that got

5  confusing.

6  Q   So you didn't knowingly write a check that you knew was

7  going to bounce?

8  A   Not a million dollar check to the government, no.

9  Q   Okay.  And that check bounced and then you had to write a

10  subsequent check.  Did you not?

11  A   Well, I went to the bank and closed the account and got a

12  bank check.

13  Q   Okay.  And if I showed you a copy of the bank check, would

14  you recognize it?

15  A   Yes.

16  Q   If I showed you a copy of the account statement which shows

17  that the account we have been talking about, the account that

18  ends in 558 where that check actually closed out the account,

19  would you recognize it?

20  A   Yes, I would.

21          MR. TANNER:  May I approach?

22          THE COURT:  You may.

23  BY MR. TANNER:

24  Q   (Tenders document.)

25          MR. TANNER:  Your Honor, may I ask the court clerk for

1    the numbers of those exhibits again?  I lost my train of

2    thought.

3            THE CLERK:  8 and 9.

4    BY MR. TANNER:

5    Q   Sir, I want you to look at Exhibit 8 marked for I.D. only

6    at this point and tell the court what that is.

7    A   It's a official check from Priority One Bank payable to the

8    U.S. Marshal in the amount of $1,071,040.52.

9    Q   And is that a true and accurate copy of that check that you

10   issued to the government?

11   A   Yes.

12   Q   And what was the purpose of that check?

13   A   To pay forfeiture.

14           MR. TANNER:  Your Honor, at this time I offer Exhibit

15   8 into evidence.

16           THE COURT:  Any objection?

17           MR. LAMARCA:  No, Your Honor.

18           THE COURT:  Admitted.

19      (EXHIBIT D-8 MARKED)

20   BY MR. TANNER:

21   Q   All right.  That's Exhibit 8, sir.  Now, I want you to

22   look, though, at Exhibit 9.  Tell the court what Exhibit 9 is.

23   A   It's a bank statement for February 15, 2017, for Priority

24   One Bank.

25   Q   And is that the statement that came out saying that you had

1  closed that account out when you were issued that official
2  check?
3  A    Yes.
4  Q    And is that a true and accurate copy of that statement?
5  A    Yes.
6        MR. TANNER:  Your Honor, we offer Exhibit 9.
7        THE COURT:  Any objection?
8        MR. LAMARCA:  No, Your Honor.
9        THE COURT:  Admitted.
10       (EXHIBIT D-9 MARKED)
11 BY MR. TANNER:
12 Q    Exhibit 9.  Does this show where you were issued the funds
13 for the check?  Does this show what your account was, what the
14 statement was at, at or around the time you were issued this
15 bank check?
16 A    Repeat that.
17 Q    Does this show -- does Exhibit 9 show the closing of the
18 account as of the date that you were issued the bank check?
19 A    Yes.
20 Q    All right.  Now, your check is slightly less, but we see
21 miscellaneous credits here.  Right?  Two thirteen twenty?
22 A    Yes.
23 Q    At the end after -- and we see a check here, one for four
24 eighteen twenty-five and one for six eighty three thirty-five.
25 Right?

1    A    Yes.

2    Q    Such that the closing debit for the account was

3    $1,071,040.52.  Right?

4    A    Yes.

5    Q    That's the exact amount of the check you gave the

6    government.  Right?

7    A    Yes.

8    Q    And the balance on that account is listed as what?

9    A    Zero.

10   Q    Okay.  And does this show the closing of the account where

11   you had liquidated all your money into for the purpose of

12   paying forfeiture?

13   A    Yes.

14   Q    All right.  Tell the court how much money you have on hand

15   as far as you recall at this point.

16   A    The money that I actually have control of?

17   Q    Yes.

18   A    About $400.

19   Q    Now, there is another Renasant Bank account listed in the

20   name of McCrory Properties, and it says that it has about

21   $7,115.57 in it.  Tell the court what that money is and where

22   it is and your access to it.

23   A    That was a joint account with my son that he always kept

24   the checkbook to it.  We used it for investments when we owned

25   real estate for taxes and that kind of thing.

1          MR. TANNER:  I pass the witness, Your Honor.

2          THE COURT:  All right.  Cross-examination.

3                    **CROSS-EXAMINATION**

4     BY MR. LAMARCA:

5     Q    Mr. McCrory, a couple of questions.  With regard to the

6     Cadillac that was purchased --

7     A    Yes.

8     Q    -- there was a balance of 33,808?

9     A    Yes.

10    Q    And that is a balance that was paid through Renasant Bank

11    that is now a loan.  Is that true?

12    A    Right.

13    Q    And in doing that, you traded in that $6,000-valued older

14    Cadillac.  Right?

15    A    Yes.

16    Q    And Renasant Bank took a security interest in the 2014

17    Cadillac?

18    A    Yes.

19    Q    And you guys had to submit a financial statement?

20    A    No.

21    Q    Did not?

22    A    No.

23    Q    Can you explain -- you're a business person.  Correct?

24    A    Yes.

25    Q    And people who make loans want to make sure that they are

```
1    going to get paid back.  Right?
2    A    Yeah.
3    Q    And you normally have to submit a financial statement?
4    A    Not on an auto loan.  This loan was made in my wife's name
5    to her which I wasn't involved in.  They wouldn't lend her the
6    money if my name was on it, and my name was off her personal
7    checking account.  She had to do both those things to get this
8    financed.
9    Q    So she did have to take some -- jump through some financial
10   hoops?
11   A    A couple, yeah, but we have been doing business at this
12   bank through all the names for 47 years, so I mean they --
13   if -- they have got a limit.  With me, it's over a hundred
14   thousand dollars that they want a financial statement.  Under
15   that, I have never had to give them one.
16   Q    All right.  And in reflection on how that -- and if you can
17   tell the court, you do show I think in what was marked as I.D.
18   Defendant's Exhibit 1 some income or retirement income for your
19   spouse.  Is that right?
20   A    Yes.
21   Q    So on what basis since 2015 has the note been paid?  By
22   whom?
23   A    By my wife.
24   Q    Out of what income?
25   A    Out of her inheritance income.
```

```
1    Q    I'm sorry?

2    A    Out of her inheritance.

3    Q    The inheritance?

4    A    Yes.  There is not any left out of our combined social

5    security and retirement income.

6    Q    All right.  Let me ask a couple more questions about in the

7    monthly expenses, the utilities and things such as that.  Do

8    you see that, the $480 in utilities?

9    A    Yes.

10   Q    And the 213 for cable, things such as that?

11   A    Yes.

12   Q    And that's on your home.  Right?

13   A    That's right.

14   Q    Now, your home is not listed --

15   A    No.

16   Q    -- on your assets?

17   A    No.

18   Q    And explain why not.

19   A    It belongs to a family trust.

20   Q    And it was put into that family trust when?

21   A    Back in 2012.

22   Q    And that's an irrevocable trust.  Correct?

23   A    That's right.  Yes, sir.

24   Q    And it's actually for the benefit of your wife and your

25   children.  Is that right?
```

1    A    Right.

2    Q    And is it also set up to where you are a beneficiary of

3    that trust?

4    A    No.

5    Q    So it would be up to their -- their relationship with you

6    whether they wanted you to stay there with them or not.  Is

7    that right?

8    A    That's pretty much how it is.  I think they have got a lien

9    on my clothes, so I would have to go with what I was wearing.

10   Q    All right.  Now, there was mention of attorneys fees that

11   had been paid, but those attorneys fees are not reflected in

12   the calculations as we have them today.  Is that right?

13   A    No, sir.

14   Q    Those are fees that have already been paid?

15   A    Yes.

16   Q    There are no more assets or any amounts due and owing on

17   those?

18   A    As of now, no.

19   Q    Okay.  Nor amounts owing back to you?

20   A    No.

21   Q    One follow-up question to what you mentioned with regard to

22   the bank where you borrowed the money or your wife did to

23   purchase the car.  At this point you had to get your name off

24   of the loan.  Is that true?

25   A    Well, they wouldn't let me on the loan.  The Cadillac was

1    paid for.  They wouldn't lend me the money, period, and I have

2    borrowed and paid back tens of millions of dollars to that

3    bank.  But I understand the situation.  And so I suppose I

4    couldn't deplete her account and her ability to repay the loan,

5    they required her to take me off of that checking account.

6    Q    All right.

7              MR. LAMARCA:  No other questions, Your Honor.

8              THE COURT:  Mr. Tanner, any additional questions?

9              MR. TANNER:  Very briefly, Your Honor.

10             THE COURT:  Okay.

11                     **REDIRECT EXAMINATION**

12   BY MR. TANNER:

13   Q    Just so we are perfectly clear on the record, you were

14   never on the loan for the Cadillac?

15   A    No.

16   Q    Now, prior to -- you mentioned to Judge Wingate or His

17   Honor Judge Wingate earlier that the only transportation you

18   have is that 2000 Jeep which you still have.  Right?

19   A    Yes.

20   Q    What was your wife driving prior to trading in the

21   Cadillac?

22   A    The 2005 Cadillac.

23   Q    Okay.  So that was your wife's mode of transportation?

24   A    Yes.  I had an Avalanche that I had already surrendered to

25   the government.

1  Q   Right.  And you were asked about the note on the vehicle.

2  Right?  Your wife took out that note.  But when I was

3  questioning you earlier, I never said one word about adding

4  that note to your monthly expenses.  Right?

5  A   No.

6              MR. TANNER:  That's all I have, Your Honor.

7              THE COURT:  Mr. Tanner, you have gone through

8  Paragraph 124 which is styled financial condition, ability to

9  pay, and you have gone through all of the assets and you have

10  also gone through all the liabilities from the presentence

11  investigation report that I worked with last time.

12             MR. TANNER:  Yes, Your Honor.

13             THE COURT:  Now, at the bottom after the liabilities

14  section is total net worth.  Now, on the sheet that I had last

15  time and that you were working from this time to modify, I had

16  $1,234,036.  What would be the total net worth now in your

17  estimation with the adjustments?

18             MR. TANNER:  I think the total assets as modified by

19  what I said should say -- prior to the check, if we could

20  subtract the check at the end.

21             THE COURT:  Okay.

22             MR. TANNER:  So the value of these assets should say

23  $1,276,385.08, except I would ask the court to consider not

24  counting that $43,000 against Mr. McCrory and permit

25  Mr. McCrory to subtract that, because we have demonstrated -- I

1    forget the exhibit number, but we have demonstrated that entire

2    sum of money was his wife's money from an inheritance.

3           THE COURT:  So then on total assets, you are -- okay.

4    You are submitting 1,276,385.08, and you want to subtract

5    43,000.

6           MR. TANNER:  Yes, Your Honor.

7           THE COURT:  Do you have your calculator there?

8           MR. TANNER:  The manual one, yes.

9           THE COURT:  I have 1,000,233.  What do you have?

10          MR. TANNER:  I have that if we subtract the 43.

11          THE COURT:  That's what I'm talking about.  So one

12   million two hundred three hundred thirty-three thousand

13   eighty-five and eight cents.

14          MR. TANNER:  Yes, Your Honor.

15          THE COURT:  Is that what you have?

16          MR. TANNER:  Yes, Your Honor.

17          THE COURT:  Okay.  Is that what the prosecution has?

18          MR. LAMARCA:  I do, Your Honor.

19          THE COURT:  And then we go down to liabilities.  What

20   would you have for the total liabilities?

21          MR. TANNER:  Your Honor, I had for the total

22   liabilities 227,500.  And I think there is something that needs

23   to be reflected here, Your Honor, where I might have messed up.

24   When I did these numbers not knowing what the court was going

25   to include and exclude, my 227,500 in liabilities does not

1    include the total 155,000 for attorneys fees between the three

2    lawyers.  And the asset number I gave you, the 1,000,233,385.08

3    does not include the fact that those have been paid.  So it

4    would cancel out on both, Your Honor.

5            THE COURT:  Okay.  So then we end up with total

6    liabilities under that cancellation of what?

7            MR. TANNER:  72,500.  But then it would also reduce

8    the assets.

9            THE COURT:  Now, I have deducted the spouse's 43,000

10   --

11           MR. TANNER:  That's right, Your Honor.

12           THE COURT:  -- in the asset column.  What else should

13   I deduct?

14           MR. TANNER:  The 155,000 for attorneys fees.

15           THE COURT:  In the asset column or liabilities?

16           MR. TANNER:  It reduced the assets when he paid it off

17   out of that same account, that 558 account.

18           THE COURT:  So it reduced -- so it went to the

19   liability section.

20           MR. TANNER:  So when -- he should have had -- instead

21   of 25,000 here, he should have had 155,000 under the

22   liabilities section, but it only lists 25.  So if we had added

23   in 155,000 as opposed to 25,000, then the numbers -- but then

24   he paid that off, so that's 155,000 that should be deduced from

25   or deducted, excuse me, deducted from the $1,233,385.08.  And

1    if the court were to do that, then the amount listed in his

2    asset column would be $1,078,385.08.  And then the liabilities

3    would remain 72,500.

4         THE COURT:  I'm not following you on that.

5    (SHORT PAUSE)

6    (*Mr. Tanner and Mr. LaMarca confer.*)

7         MR. TANNER:  Your Honor, I realize where the problem

8    was.  I was saying I had overstated what Mr. McCrory had paid

9    in his attorneys fees because he had already paid a portion of

10   that before, so it should not be 155.  I think Mr. LaMarca and

11   I have found where I overstated something.  Can I sit down and

12   clean this paper up and give the court --

13        THE COURT:  Go right ahead.  Meanwhile I will just

14   state for the record that during this interval the defense

15   counsel and the prosecutor have been communicating at the

16   podium on these numbers, and I have allowed them to speak with

17   each other on this point.  And are you telling me now,

18   Mr. Tanner, that you all have reached a consensus as to these

19   numbers?

20        MR. TANNER:  Yes, Your Honor.

21        THE COURT:  All right.  Mr. McCrory, you can step

22   down.

23   (SHORT PAUSE)

24        THE COURT:  Now, I need to address my probation

25   officer in the interim.  Ms. Harrell?

1          PROBATION OFFICER:  Yes, Your Honor.

2          THE COURT:  Have you been making your own corrections?

3          PROBATION OFFICER:  I have, Your Honor.

4          THE COURT:  And would you -- before you advise me of

5    what those numbers are, would you meet with the two counsel and

6    tell them what your numbers are?

7          PROBATION OFFICER:  Yes, Your Honor.

8          THE COURT:  Then I will see if there is a

9    disagreement.

10          PROBATION OFFICER:  Yes, Your Honor.

11          THE COURT:  All right.  Go right ahead.

12       (SHORT PAUSE)

13          THE COURT:  Have you now completed your conference?

14          MR. TANNER:  Yes, Your Honor.

15          MR. LAMARCA:  Yes, Your Honor.

16          THE COURT:  Ms. Harrell?

17          PROBATION OFFICER:  Yes, Your Honor.

18          THE COURT:  Are you satisfied?

19          PROBATION OFFICER:  I am, Your Honor.

20          THE COURT:  Now, I'm going to let Mr. Tanner provide

21    to me the totals for the different columns.  Mr. Tanner, what's

22    the total for the asset column?

23          MR. TANNER:  Your Honor, total assets would be

24    $40,008.63.

25          THE COURT:  Mr. LaMarca, do you agree?

1          MR. LAMARCA:  Yes, Your Honor.

2          THE COURT:  Ms. Harrell, do you agree?

3          PROBATION OFFICER:  Yes, Your Honor.  Based on the

4   testimony presented today, I do agree.

5          THE COURT:  Okay.  Now, Mr. Tanner, the total for the

6   liabilities column.

7          MR. TANNER:  $72,500.

8          THE COURT:  72,500?

9          MR. TANNER:  Yes, Your Honor.

10         THE COURT:  And, Mr. LaMarca, do you agree?

11         MR. LAMARCA:  Yes, Your Honor.  As Ms. Harrell said,

12  based on the testimony today, I do.

13         THE COURT:  Ms. Harrell, do you agree?

14         PROBATION OFFICER:  I do, Your Honor.

15         THE COURT:  Back to you again.  Total net worth.

16         MR. TANNER:  Negative $32,491.37.

17         THE COURT:  Mr. LaMarca, do you agree?

18         MR. LAMARCA:  Yes, Your Honor.

19         THE COURT:  Ms. Harrell, do you agree?

20         PROBATION OFFICER:  Yes, Your Honor.

21         THE COURT:  With regard to this page and this

22  paragraph number, the paragraph number is 124 and the page

23  number of the presentence investigation report is Page 28,

24  then, Ms. Harrell, I would like an addendum to the presentence

25  investigation report because I would like these original

1   numbers to remain in the presentence investigation report but

2   the addendum should reflect that these changed numbers are the

3   result of testimony Mr. McCrory gave under oath today.

4          PROBATION OFFICER:  Yes, Your Honor.  I can include

5   that in the statement of reasons.

6          THE COURT:  All right.  Now then, Mr. Tanner, on to

7   Page 29.  At the top of that page is monthly income.  Are there

8   any adjustments?

9          MR. TANNER:  Do you want it by testimony or by

10  proffer?

11         THE COURT:  Both.  All right, Mr. Tanner, on monthly

12  income.

13  BY MR. TANNER:

14  Q   Mr. McCrory, you're Cecil McCrory?

15  A   Yes.

16  Q   And you're the same Cecil McCrory that testified earlier?

17  A   Yes.

18  Q   You recognize you are still under oath, sir?

19  A   Yes, I do.

20  Q   All right.  Mr. McCrory, looking at the presentence

21  investigation report, Defense Exhibit 1 for I.D. only that was

22  Page 2 of that document which would be the cash flow statement

23  portion of the presentence investigation report, I would like

24  you to look at it, sir, starting with the subsection styled

25  monthly income and tell me whether there are any changes that

1    you request the court enter to your monthly income.

2    A   It would start on groceries and supplies.  I had said $450.

3    Q   You're looking at expenses.

4         THE COURT:   Income.  You went down to monthly

5    expenses.

6    A   There is no interest income anymore.  Retirement income has

7    changed.  It has went down $185 for Medicare supplements

8    insurance.  And, other than that, nothing has changed.  Let me

9    back up on that a little.  That doesn't include my wife's

10   supplements on hers, so hers is 145 a month.

11   Q   How about we back all the way up?  Start with interest

12   income.  You said that's gone.

13        THE COURT:   That was a hundred dollars.

14        MR. TANNER:   That was a hundred dollars.

15   BY MR. TANNER:

16   Q   You said there are two listings for retirement income, one

17   for you and one for your spouse?

18   A   Right.

19   Q   Yours in Paragraph 124 at Page 29 says that your monthly

20   income is $3,080.00.  Tell the court what that income should be

21   for you at this point.

22   A   That is for me.

23   Q   So that remains the same?

24   A   Yes.

25   Q   All right.  Now let's go down to where it says retirement

1    income, spouse.  The presentence report says $872.  Is that any

2    different?

3    A    As far as I know, that's the same, too.

4    Q    So then your total monthly income as listed in the

5    presentence report is -- as is written now is $4,052.  Right?

6    A    Yes.

7    Q    And so you're saying it should be 3,952?

8    A    Yes.

9    Q    Okay.  All right.  If we can now go down to monthly

10   expenses, let's start with utilities.  It says for utilities

11   you pay $480 a month.  Is that number the same or should it be

12   changed?

13   A    That's about the same.

14   Q    Okay.  Telephone, and it lists telephone and cable.  I'm

15   assuming that's some package or something?

16   A    It is.

17   Q    It says $213.  Is that the same or has it changed?

18   A    No, it's still about right.

19   Q    The next item is groceries and supplies.  It lists the

20   value at $450 per month.  Is that the same?

21   A    No, it's changed.  When my wife read this, she made me go

22   to Wal-Mart with her, and it's 650 is more in line with what

23   groceries are a month.

24   Q    So you're adding 200 to the amount you assumed for

25   groceries and supplies?

1   A    Yes.

2   Q    All right.  Gas and transportation costs, you have it

3   listed at $200.

4   A    That's probably real close to the same.

5   Q    All right.  Auto insurance, $200.

6   A    No.  That's per month.  That's about the same.

7   Q    Okay.  Cellular phone, it lists $140.  Is that the same or

8   should it be amended?

9   A    It should be about 165.

10  Q    Clothing, you list $200.  Should that be the same?

11  A    I wouldn't think that had changed much.

12  Q    Health insurance, $940.  Is that the same or should it be

13  amended?

14  A    That goes away.  That was Cobra.

15  Q    That was Cobra?

16  A    Yeah.  Then I went to Medicare, Medicaid, whatever.  At the

17  time we did this, I was 64 and I had Cobra that I was paying.

18  Q    Okay.  And so there is no expenditure related to your

19  health insurance anymore?

20  A    Yeah.  Back up here on my income, the combined total of

21  mine and my wife's supplemental policies, you know you have to

22  have a supplement policy with Medicare, and there is still like

23  a 15 percent that nothing covers.  I would think -- well, the

24  940 would go away.  I still have about a hundred dollars a

25  month copay on meds.

1    Q    And what about the supplement?

2    A    Yeah.

3    Q    That is the supplement?

4    A    No, no, no.  The supplement on medication is $25 a month,

5    but it leaves me with a copay of still about a hundred or a

6    little over.

7    Q    All right.  What is the total amount you spend on health

8    care per month?

9    A    $410.

10   Q    Is that for you and your wife?

11   A    Yes.

12   Q    All right.  The loan payment to Community Bank is still

13   1,200.  Right?

14   A    Yes.

15   Q    Are there any other expenses that are not listed here that

16   the court should take into account?

17   A    None that I can think of right now.

18   Q    Okay.

19   A    Well, my wife's car payment, but she pays that out of her

20   inheritance.

21   Q    Okay.  And how much is that car payment?

22   A    996 a month.

23            THE COURT:  Mr. Tanner, are you seeking to subtract

24   that?

25            MR. TANNER:  No, Your Honor.  I put that as a note to

1    the side.

2           THE COURT:  All right.  Because I want to point out

3    that if you are seeking to subtract that, you've already asked

4    the court to subtract the monies that she gets in her own

5    account, so I don't know if that would be appropriate.

6           MR. TANNER:  It would not.

7           THE COURT:  Okay.

8    BY MR. TANNER:

9    Q    Are there any other changes you're suggesting?

10   A    None.

11   Q    All right.

12       (SHORT PAUSE)

13          THE COURT:  Mr. Tanner, we now come up with a figure

14   of somewhere around $984?

15          MR. TANNER:  For his cash flow?

16          THE COURT:  No, for monthly expenses.

17          MR. TANNER:  No, sir, I don't believe so.

18          THE COURT:  What do y'all come up with?

19          MR. TANNER:  $3,718.

20          THE COURT:  I see.  Hold it.  I'm sorry.  I did mine

21   based on the Community Bank figure.  Now then, so that 4023 --

22          MR. TANNER:  The Community Bank figure should be

23   included.  I didn't include that.

24          THE COURT:  You want to still include that $1,200?

25   Okay.  Then we come up with total monthly expenses of 4,023

1    initially, and we're going to increase that by $225.  That's

2    going to give us 4,248.  Then we're going to subtract about

3    531, the difference between 940 and 410.

4             MR. TANNER:  Your Honor, I have as a total monthly

5    expenditures $4,918.

6             THE COURT:  Now, how do you get that?  And, Mr.

7    LaMarca, what do you have?

8             MR. LAMARCA:  May I have just a minute, please, Your

9    Honor?

10            THE COURT:  Okay.

11       (SHORT PAUSE)

12            THE COURT:  Ms. Harrell, are you following along on

13   this?

14            PROBATION OFFICER:  I am, Your Honor.

15            THE COURT:  Do you have your figure already?

16            PROBATION OFFICER:  I do, Your Honor.

17            THE COURT:  What is yours?

18            PROBATION OFFICER:  Mine was $3,718 total monthly

19   expenses.

20            MR. TANNER:  Your Honor, may I address that?

21            THE COURT:  Ms. Harrell, what is yours?

22            PROBATION OFFICER:  $3,718.

23            THE COURT:  Okay.  The only difference, Ms. Harrell,

24   we have is 1 dollar.  I have 3,717.

25            MR. TANNER:  Your Honor, I think we're not adding in

1    the 1,200.  That's not the car loan payment.  The 1,200 is from

2    the 72,000 he owed as a liability.  If you're excluding the

3    1,200 --

4           THE COURT:  Let's leave the 1,200 in.

5           PROBATION OFFICER:  Your Honor, my figure was with the

6    $1,200.

7           THE COURT:  So is mine.

8           PROBATION OFFICER:  If I may, I can go through what

9    figures I used to get the number.

10          THE COURT:  See if you follow mine.  Well, one second.

11   Let them finish caucusing over here.

12          PROBATION OFFICER:  Yes, Your Honor.

13     (SHORT PAUSE)

14          THE COURT:  Ms. Harrell, we have the same number.  Let

15   me just wait on them to finish.

16          PROBATION OFFICER:  Yes, Your Honor.

17     (SHORT PAUSE)

18          MR. TANNER:  3,718, Your Honor?

19          THE COURT:  That's what I have.  3,718 for the total

20   monthly expenses.  Now, give me your figure for total monthly

21   cash flow.  Ms. Harrell, what do you have?

22          PROBATION OFFICER:  Your Honor, for a total monthly

23   cash flow, I have $234.

24          THE COURT:  Okay.

25          MR. TANNER:  We have the same, Your Honor.

1          THE COURT:  You have the same number?  234.  Mr.
2     LaMarca, 234?
3          MR. LAMARCA:  Yes, Your Honor.
4          THE COURT:  Okay.  Now then, now that we have these
5     numbers, I state for the record the following:
6          Paragraph 124 of the presentence investigation report
7     has now, pursuant to the testimony, has been significantly
8     modified as pursuant to the testimony.  So we began with total
9     assets of $1,939,455.  And now, Mr. Tanner, the total assets
10    come to what?
11         MR. TANNER:  $40,008.63.
12         THE COURT:  And that's the total assets, so we have
13    gone from the figure I just announced to that figure.
14         And then with regard to liabilities, in the
15    presentence investigation report that same Paragraph 124, Page
16    28, we have now gone from total liabilities of $705,419 to
17    what, Mr. Tanner?
18         MR. TANNER:  72,500.
19         THE COURT:  And then the total net worth as reflected
20    on Page 28, 124, was $1,234,036.  And that now is a negative.
21    Is that correct, Mr. Tanner?
22         MR. TANNER:  Yes, Your Honor, a negative $32,491.37.
23         THE COURT:  All right.  And then on the next page on
24    monthly income as to the presentence investigation report when
25    prepared, it was $4,052.  And it is now, Mr. Tanner?

1              MR. TANNER:  $3,952.

2              THE COURT:  Yes.  And then the next column was monthly

3    expenses, and the presentence investigation report when

4    prepared had total monthly expenses as $4,023, which now,

5    Mr. Tanner?

6              MR. TANNER:  $3,718.

7              THE COURT:  And the total monthly cash flow was $29

8    when the presentence investigation report was prepared.  And

9    now, Mr. Tanner?

10             MR. TANNER:  $234, Your Honor.

11             THE COURT:  All right.  Now, Mr. LaMarca, do you

12   disagree with any of these calculations?

13             MR. LAMARCA:  I do not.

14             THE COURT:  Ms. Harrell, do you disagree with any of

15   these calculations?

16             PROBATION OFFICER:  I do not.

17             THE COURT:  All right.  Thank you.  So then, Mr.

18   McCrory, you can have a seat.  Thank you.

19        (SHORT PAUSE)

20             THE COURT:  Now, Ms. Harrell, I will start back with

21   you.  Now we have the concrete figures for the modifications of

22   the presentence investigation report.  I have given the figures

23   that were included in the report at the time that I sentenced

24   Mr. McCrory.  We now have changed figures.

25             So now what is the recommendation from probation as to

1    the amount of a fine, should the court choose to impose a fine?

2             PROBATION OFFICER:  Your Honor, based on the figures

3    we have now, it definitely does not appear the defendant could

4    pay an immediate fine, meaning a fine today or within the next

5    30 days within the guideline range.  The court has the option

6    based on this information to not impose a fine or to impose a

7    partial fine, meaning a fine under the guideline range or a

8    fine payable on an installment basis at the lower end of the

9    guideline range.

10            Based on this --

11            THE COURT:  Now, Ms. Harrell, before you make your

12   recommendation, I will remind you of what you certainly are

13   aware of the different factors to be taken into account towards

14   any fine, and the ability to pay is only one of several factors

15   that the court should take into account.  There is the gravity

16   of the crime, for instance, that needs to be taken into account

17   as well as all these other factors that Mr. Tanner related to

18   the court previously that should be taken into account when a

19   fine is imposed.

20            Now, have you considered all of these factors and

21   taken that into account before you make your recommendation?

22            PROBATION OFFICER:  I have, Your Honor.

23            THE COURT:  Okay.  Now then, go ahead and make your

24   recommendation.

25            PROBATION OFFICER:  Your Honor, at the beginning of

1    this hearing, Mr. Tanner asked the court to reduce the fine
2    from $150,000 to somewhere between $15,000 and $20,000.  I
3    think based on the gravity of the offense and while not
4    unsubstantial the significantly lighter sentence than this
5    defendant was originally facing of incarceration, I still think
6    a $20,000 fine is appropriate, obviously not due immediately
7    because I do not believe he has the ability to pay that fine
8    immediately, meaning today.  However, I would suggest that the
9    payments begin while the defendant is incarcerated so that a
10   portion of whatever he earns or receives goes toward the
11   payment of that fine.

12         I do also recommend any interest be waived and that
13   when he is released from incarceration he be placed on a
14   payment plan of no less than $150 per month.  Obviously it will
15   not be paid within the two-year time period that he is on
16   supervised release.  It is my suggestion that he be ordered to
17   come to an agreement with the U.S. Attorney's Financial
18   Litigation Unit for payment of the remainder of the fine after
19   his termination from supervised release and that he be included
20   in the Treasury Offset Program with the U.S. Attorney's Office
21   so that any federal benefits, any eligible federal benefits may
22   be used to offset criminal monetary penalties.  And that is
23   probation's recommendation.

24         THE COURT:  Okay.  Thank you.  Let me turn now to the
25   prosecution.

1      MR. LAMARCA:  We have no objections to that, Your

2  Honor.

3      THE COURT:  Okay.  Thank you.  Mr. Tanner?

4      MR. TANNER:  Your Honor, my initial request was for 15

5  to $20,000, and I think probation's recommendation being at the

6  bottom of the guideline is a fair sentence under -- a fair fine

7  amount under the circumstances.

8      I would again reiterate that Mr. McCrory -- well, that

9  the government rather went through Mr. McCrory's finances with

10  a fine-toothed comb and figured out pretty much every

11  account -- not that he wasn't forthcoming or anything, but they

12  figured out all his assets, and that was a condition of his

13  plea and plea recommendation.  So I would ask the court to

14  consider those factors as I'm sure it's doing, consider the

15  fact that he has forfeited more than a million dollars and also

16  consider the fact, Your Honor, that he still owes the

17  government an additional 130 some odd thousand dollars.

18      And just to make the point, Your Honor, I know the

19  court is aware but I would like it to be stated that forfeiture

20  is not restitution; it's separate and apart from that, and it

21  was designed for the specific purpose of punishment.  So when

22  you look at those factors that the court referenced earlier

23  considering the fine in light of the other portions of the

24  defendant's sentence, I would ask the court to consider that he

25  has been taxed heavily and is still going to be taxed when it

1    decides what fine amount to order.

2              THE COURT:  All right.  Thank you.  Initially when I

3    ordered the fine of $150,000, I was guided by the financial

4    sheets concerning this defendant.  It appeared that he

5    certainly had the ability to pay, because the court made its

6    determination of the fine amount separate from the restitution

7    amount.  And all of that was done before he tendered his check

8    that was later accepted by the government of over a million

9    dollars.  So his financial situation indeed has changed, and

10   the court is willing to reduce the fine amount.

11             I am going to reduce it to $20,000.  I'm going to

12   accept the recommendation of the probation officer and for the

13   reasons that she described.  The court has looked at all the

14   factors that the court need consider in circumstances such as

15   this, and the court is satisfied that the $20,000 would be

16   compliant with the aims of fine jurisprudence or at least the

17   jurisprudence of fines.  And, therefore, the court modifies its

18   previous imposition of the $150,000 fine to one of $20,000.

19             Earlier the court said that it wanted all of these

20   changes on Pages 28 and 29 of the PSR to be submitted as an

21   addendum so that one who might happen to read this report will

22   see the original calculations and also the subsequent

23   calculations if there are any questions as to how the court

24   managed to come up with a difference in the fine range.  So

25   that is the determination of the court.

1          The court is further impressed with the statements of

2     the probation officer as well as those of defense counsel on

3     this notion as to whether the defendant can pay this amount at

4     one time.  The court agrees that he cannot do so.  He is to

5     begin any payments if he has monies to so satisfy immediately

6     and during the course of incarceration.  The court does not

7     expect that he will have paid this $20,000 by the end of

8     incarceration, and the court accepts the recommendation of the

9     probation officer that this matter be carried over to

10    supervised release, and, thereafter, if he has not completed

11    his fine payments at the conclusion of supervised release that

12    this matter then be taken up with the U.S. Attorney's Financial

13    Litigation Unit and that the defendant is directed to enter

14    into an agreement with that unit to pay any remaining balance

15    timely on a schedule of not less than $150 per week.

16          Now, that will be during -- did I say a week?  It's

17    supposed to be a month.  $150 a month.  And that will carry

18    over during the course of supervised release and also beyond

19    that time period even after he has completed his supervised

20    release term.

21          Now, are there any questions from the defense?

22          MR. TANNER:  Not about the sentence, Your Honor, no.

23          THE COURT:  Do you have another question?

24          MR. TANNER:  I do, Your Honor.

25          THE COURT:  What's your question?

1          MR. TANNER:  Whether the court wanted to hear -- one

2     of the things the court wanted a report on when we came back

3     today was this matter of Mr. McCrory's participation in a

4     deposition related to the six state-court cases that were filed

5     in the Circuit Court of Hinds County.  We told the court that

6     Mr. McCrory was going to be doing a deposition in that matter,

7     and the court asked the attorneys who are representing the

8     State of Mississippi in that case to come back on today and

9     report to the court on the status of that matter.  So as far as

10    the court's sentence is concerned, Your Honor, I have no

11    questions or anything, but I just wanted to remind the court

12    that that was another matter the court wanted to hear on today.

13         THE COURT:  All right.  Thank you.  Now, Mr. LaMarca,

14    on behalf of the U.S. Attorney's Office, any questions about

15    the court's sentence with regard to fine?

16         MR. LAMARCA:  No, Your Honor.

17         THE COURT:  All right.  And my probation officer, I

18    accepted your recommendations.  You will prepare the necessary

19    addendums as well as the reasonings behind the court's changed

20    approach to the fine.  And in your statement of reasons, you

21    will indicate that the court has taken into account all of the

22    factors that go into the imposition of fines, that the court

23    has considered all of those factors and the court has

24    determined that the fine of $20,000 is appropriate pursuant to

25    those matters.

1          PROBATION OFFICER:  Yes, Your Honor.  Would Your Honor

2     also like the defendant included in the Treasury Offset

3     Program?

4          THE COURT:  If he receives -- do you expect for him to

5     receive any such monies?

6          PROBATION OFFICER:  That is just in case.  That allows

7     the government to use any type of eligible federal benefits to

8     offset the balance of the fine.  I believe it's tax returns,

9     tax refunds mostly.

10          THE COURT:  I looked at his tax returns.  He filed his

11     tax returns all the way through '10 through '13.  They are

12     listed here in the presentence investigation report on Page 29.

13          PROBATION OFFICER:  Yes, Your Honor.  This would allow

14     future tax refunds to be put toward the fine amount.

15          THE COURT:  And your recommendation?

16          PROBATION OFFICER:  Yes, Your Honor, it is my

17     recommendation that he be included in that program.

18          THE COURT:  Okay.  Then I'm going to accept that

19     recommendation that if any monies come from those sources

20     then -- that would ordinarily go towards him but then he could

21     use that money towards the payment of his fine.

22          PROBATION OFFICER:  Yes, Your Honor.

23          THE COURT:  This offset program is normally accorded

24     to defendants, so he is not getting any special treatment from

25     it because this is something that ordinarily is provided to

1    defendants where these circumstances arise.  So I will allow

2    him to take advantage of that just as any other defendant would

3    have been able to take advantage.  Anything else?

4              PROBATION OFFICER:  No, Your Honor.

5              THE COURT:  All right.  Thank you.

6              Now, let's go to the next matter and last matter.  At

7    the last time we discussed whether Mr. McCrory should report at

8    a certain time period based upon a request for his aid at

9    depositions involving some other cases.  Mr. Tanner, where are

10   we on that?

11             MR. TANNER:  Your Honor, that deposition had been

12   noticed for April 24th -- no, 25th or 27th or something like

13   that, but it has since been moved as I appreciate it to May 15

14   of 2017.

15             THE COURT:  May 15th.  All right.  Let me hear from

16   some of those attorneys.

17             MR. BARRETT:  May it please the court, Your Honor, Don

18   Barrett for the State and George Neville for the State.  We

19   have -- there are 39 law firms defending these various

20   defendants that Mr. McCrory has testimony about, and we have

21   gone to extraordinary lengths to accommodate as many as we

22   could.  We told one of them yesterday if we scheduled it on the

23   12th of never, some of them wouldn't be able to come, but we

24   set it for May 15th.  There are -- some of the defendants have

25   filed motions for protective orders to prevent his deposition

1    from going forward.  We will vigorously oppose those motions

2    for protective orders.  We think the deposition will go forward

3    and will go forward on May 15th.  Of course, we can't speak for

4    what the court may rule, but we are committed to taking this

5    deposition as expeditiously as possible.  I will say that Mr.

6    McCrory has remained extraordinarily cooperative with the State

7    of Mississippi in its efforts to recover the monies that are

8    due it because of this scandal.  Thank you.

9            THE COURT:  All right.  And there are some other

10   persons here?  Yes.

11           MR. NEVILLE:  Your Honor, some of the defense counsel

12   are here as well.

13           THE COURT:  Let me hear from defense counsel.

14           MR. BOSCHERT:  Your Honor, I'm Neville Boschert.  I

15   represent GEO Corporation in one of the cases that has been

16   filed by the State of Mississippi.  I also have with me Carolyn

17   Short who is an attorney from Philadelphia, Pennsylvania, who

18   is also counsel for GEO.  We did not know this was taking place

19   today.  We knew there was a potential -- potentially you could

20   set a date for him to report today.  That's why we came.  We

21   had no idea that the issue of the deposition was going to be

22   discussed until within the last two or three minutes whenever

23   it was mentioned.

24           THE COURT:  Do you understand why the deposition has

25   come up?  I'm not going into any substantive aspects of the

1    deposition.  The way the deposition came up was that he was

2    supposed to report.  And there has been a motion to delay that

3    reporting date to prison in view of this deposition that's

4    supposed to be scheduled.

5              MR. BOSCHERT:  All I was going to say is on behalf of

6    GEO we have objected to that deposition date as being too early

7    in the litigation.  The suit was recently filed, and, one,

8    there has been no discovery done, that the pleadings are not

9    closed, and we think it ought to be taken at a later date.  We

10   have had no opportunity to do any discovery of Mr. McCrory

11   while the State of Mississippi has had extensive access to Mr.

12   McCrory, it is our understanding.  And we have had none.  So we

13   are objecting to the deposition being taken so soon.

14             As far as the reporting date, Your Honor, that's -- we

15   really have no interest in that other than we think the

16   deposition date that they are setting is too early.

17             THE COURT:  Now, you know that deposition date and

18   that whole quarrel is in another court.

19             MR. BOSCHERT:  Yes, Your Honor.  We know that.  I'm

20   just pointing that out to the court.

21             THE COURT:  And that my interest in the deposition is

22   only as it might affect Mr. McCrory's report date.

23             MR. BOSCHERT:  I understand that.

24             THE COURT:  So that was all.  They were advising me.

25             MR. BOSCHERT:  We are just pointing that out to the

1    court.

2          THE COURT:  Well, thank you for pointing that out, but

3    you are telling me in essence that you are going to oppose that

4    deposition.

5          MR. BOSCHERT:  Yes, Your Honor.

6          THE COURT:  Then I will be looking to see what happens

7    on that.

8          MR. BOSCHERT:  We will have to find out.

9          THE COURT:  Thank you.  And I had another defense

10   counsel here?

11         MR. HINTON:  Yes, Judge.  Brian Hinton.  I represent

12   one of the other companies, Admin Pros, in one of the Hinds

13   County cases.  Actually there is 11 cases.  There are six in

14   Hinds and five in Rankin County.  The cases were filed at the

15   end of February.  In my case, Mr. McCrory hasn't even filed an

16   answer yet, so he is not even properly before the court in my

17   case and they have noticed his deposition.  I have filed a

18   motion for protective order.  There are also motions to

19   consolidate all of those cases that is now pending, and I think

20   a couple of the cases are set for hearing before Judge Kidd on

21   the motion to consolidate.  I say all of that to say it is

22   highly unlikely with all of these issues that are pending that

23   that deposition is actually going to go forward that day.

24   Again, I can't tell you what the court will do.  I believe it's

25   unlikely.

1              THE COURT:  You say you have filed for a protective

2    order yourself?

3              MR. HINTON:  Yes, Judge.

4              THE COURT:  This is a matter of public record now?

5    Your filing?

6              MR. HINTON:  It is.

7              THE COURT:  Okay.  So then what is the basis for your

8    protective order?

9              MR. HINTON:  To echo what counsel said, it is

10   premature.  First of all, he hasn't answered as a codefendant

11   in my case.  I can't serve him with discovery.  There has been

12   no discovery done at all.  None.  There has been none

13   propounded.  A codefendant in the case just answered the other

14   day, and she did propound some discovery on a week ago to the

15   state.  These cases have just begun, and they are trying to

16   arbitrarily drag all of defense counsel to this deposition to

17   take his deposition before we do discovery.  Now, what's going

18   to happen is either it's not going to go forward or we are

19   going to go forward with it on a limited basis and then we're

20   going to have to go back again at a later date after he reports

21   and after discovery is completed and do it again, because it

22   won't be very meaningful at this point.

23             THE COURT:  All right.  Thank you so much.  Are there

24   any other defense counsel?  All right.  Thank you so much.

25             So, Mr. Tanner, now let's discuss your client's report

1    date.

2            MR. TANNER:  Yes, Your Honor.

3            THE COURT:  Go to the podium, please.  So then what is

4    your suggestion about his report date in view of what I have

5    just heard?  And then I will ask Mr. LaMarca after that.

6            MR. TANNER:  What is my suggestion?  Well, my

7    suggestion is that he be given -- I don't know anything about

8    the other case in terms of what's been filed, but if it's as

9    the last gentleman represented and there is a motion out there,

10   it may be prudent to wait until that motion is heard whether

11   the protective order is granted.

12            But I know we do have probably at a minimum a six-week

13   cushion before BOP would even designate him from the date of

14   whatever date the judgment is actually entered.  So I think as

15   it stands that May 15 deposition, Mr. McCrory is ready and able

16   to show up and submit himself to be deposed.  But I don't

17   really -- I know that Mr. McCrory was served with a subpoena

18   and he is going to be there present for the deposition and give

19   truthful testimony, and I'm also aware that logistically I

20   think it may be a nightmare for Mr. McCrory to be in jail while

21   these 39 some odd law firms are there in whatever portion of

22   the country or place in the country he is serving at that

23   particular time to be deposed.  But I know this court isn't

24   holding it up to some indefinite period for him to report to

25   prison.  I mean he has to go do his time.  He acknowledges that

1    and he understands that.

2         But we are asking for a reasonable time so he can do

3    what is necessary to cooperate with the state.  The only

4    problem, I don't have much information as to say the particular

5    status of where these motions are.  I think Mr. Barrett may be

6    able to speak to that because that was raised in more detail

7    after he had spoken, so he might be able to speak better to

8    that than I would.

9         THE COURT:  Well, what date is the subpoena ordering

10   him to appear in state court?

11        MR. TANNER:  May 15 for the deposition.

12        THE COURT:  May 15.

13        MR. TANNER:  Yes, sir.

14        THE COURT:  All right.  Thank you.  I am going to

15   allow Mr. McCrory to remain on the same bond that he is now

16   under, and the court is going to make some adjustment if

17   necessary on May 15th if not before.  The court will make an

18   adjustment before May 15 if the circuit court, the state court,

19   makes some disposition on the matter.  For instance, if the

20   state court holds that the matter of the deposition is

21   premature at this point, then the court will have Mr. McCrory

22   come back before this court at that time and then the court

23   will order the imposition of sentence, the serving of the

24   sentence.  Otherwise, if the state court allows the deposition

25   to go forward, then the court is going to wait until after the

1    deposition is taken.

2              Mr. McCrory, do you understand that you are under the

3    same bond you were under before?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  All right.  And, Mr. LaMarca, is there an

6    objection to this approach?

7              MR. LAMARCA:  Your Honor, we do.  We object to the

8    fact that the criminal case is contingent upon proceedings that

9    may take place in a civil matter.  We're asking the court to

10   set a report date six weeks from today which gives the Marshal

11   Service or, I'm sorry, BOP the time to designate a facility;

12   that that six-week date would be May 25th as a reporting date.

13   It's beyond the current deposition date.  It would give in

14   essence all the civil litigants something that they can tell a

15   civil judge or the judge who is presiding over the civil cases

16   of pretty much a drop-dead date; otherwise, Your Honor, as the

17   court can be -- I'm sure is well aware that there are a number

18   of issues that develop in civil cases that depositions may or

19   may not take place on the dates that are set.

20             So we ask the court not to make the criminal case

21   contingent upon proceedings in the civil matter, set the report

22   date six weeks from today, which would be May 25th, and then

23   that gives everyone else notice of when Mr. McCrory will have

24   to report and may actually lead to his deposition being taken

25   before then rather than subsequent.

1          THE COURT:  All right.  Thank you.  I have taken all

2     of that into account, and I'm going to adhere to the prior

3     statements of the court, because I don't want Mr. McCrory

4     reporting and then after that have him by necessity to come

5     back here to offer testimony and have the BOP served with a

6     subpoena requiring him to come back to state court if the court

7     can address all of this now.  If this can't go forward now,

8     then the attorneys will be in the same posture you just

9     mentioned.

10          So the court is going to adhere to its prior statement

11    that we will see if this deposition goes forward.  If it goes

12    forward, that might address the circumstance; if it doesn't,

13    then I will deal with it at that time.  So that's what we will

14    do.

15          Ms. Harrell?

16          PROBATION OFFICER:  Your Honor, I just want to make

17    sure I understand what Your Honor is wanting to do in this

18    case.  Are you going to hold the judgment until after the

19    deposition date?

20          THE COURT:  May 15.

21          PROBATION OFFICER:  So don't file the judgment yet?

22          THE COURT:  That's right.

23          PROBATION OFFICER:  Thank you.  That's all I needed.

24          THE COURT:  Until I give you the order to go ahead and

25    do it.

1              PROBATION OFFICER:  Yes, Your Honor.

2              THE COURT:  Again, Mr. McCrory, you understand this

3    conversation?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  You have been complying with all the

6    conditions thus far, and I expect you to remain complaint.

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  All right.  With that, then you all are

9    excused.

10        *(Hearing was concluded.)*

```
1                    CERTIFICATE OF REPORTER

2

3         I, BRENDA D. WOLVERTON, Official Court Reporter,

4    United States District Court, Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true and correct transcript of the

7    proceedings had in the aforenamed case at the time and

8    place indicated, which proceedings were recorded by me to

9    the best of my skill and ability.

10         I certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13         This the 18th day of April, 2017.

14

15                           s/ Brenda D. Wolverton_____
                             BRENDA D. WOLVERTON, RPR-CRR
16

17

18

19

20

21

22

23

24

25
```